Filed 2/27/18; pub. order 3/23/18 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JONATHAN ARVIZU,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF PASADENA,<br><br>    Defendant and Respondent. | B277951<br><br>(Los Angeles County<br>Super. Ct. No. BC550929) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michelle Williams Court, Judge. Affirmed.

Grassini, Wrinkle & Johnson, Roland Wrinkle and Lars C. Johnson for Plaintiff and Appellant.

Michele Beal Bagneris, City Attorney, Ann Sherwood Rider, Assistant City Attorney, for Defendant and Respondent.

## INTRODUCTION

Plaintiff and Appellant Jonathan Arvizu sued the City of Pasadena after he fell over a retaining wall located beside a recreational trail in the City's Arroyo Seco Natural Park, resulting in devastating personal injuries. Arvizu had entered the Park in the dark, pre-dawn hours, while it was closed, in order to go "ghost hunting" with a group of friends. While taking a shortcut to reach the trail, he lost his footing, careened across the trail, and fell over the wall.

He appeals the trial court's grant of summary judgment. The trial court held that "trail immunity" under Government Code section 831.4, subd. (b)[1] – which provides that a public entity "is not liable for an injury caused by a condition of" any trail used for recreational purposes – barred Arvizu's section 835 claim for dangerous condition of public property. The trial court also held that Arvizu failed to raise a triable issue concerning whether the retaining wall was substantially dangerous when used with due care. It therefore granted summary judgment on the additional ground that the embankment was not a dangerous condition of public property per sections 830(a) and 835.[2]

---

[1] Future statutory references are to the Government Code unless noted.

[2] The trial court did not reach other grounds raised by the City in support of its summary judgment motion.

The Legislature provided for trail immunity to encourage government entities to keep trails and parkland open to the public. "[E]nsuring immunity for dangerous conditions on recreational trails of all kinds 'encourage[s] public entities to open their property for public recreational use.' [Citation.] 'The actual cost of . . . litigation [over injuries suffered by . . . recreational users of . . . paths], or even the specter of it, might well cause cities or counties to reconsider allowing the operation of a . . . path, which, after all, produces no revenue.' [Citation.] ' "No doubt it is cheaper to build fences and keep the public out than to litigate and pay three, four, five or more judgments each year in perpetuity. But that would deprive the public of access to recreational opportunities. If public entities cannot rely on the immunity for recreational trails, they will close down existing trails and perhaps entire parks where those trails can be found." ' " (*Montenegro v. City of Bradbury* (2013) 215 Cal.App.4th 924, 932) (*Montenegro*).

The Legislature first enacted the trail immunity statute more than 50 years ago.[3] Its goal of preserving the public's access to trails and open space recalls iconic California conservationist John Muir's teachings that we all need access to wildlands and open space, "where nature may heal and give strength to body and soul alike."[4] Now, with California's population approaching 40 million, and especially in Los Angeles County, where more

---

[3]    Statutes 1963, chapter 1681. The current language dates to 1970. (See Historical and Statutory Notes, 32 Pt. 2 West's Ann. Gov. Code (2012 ed.) foll. § 831.4, p. 78)

[4]    Muir, The Yosemite (1912) page 256.

3

than a quarter of the State's residents reside,[5] the need to preserve access to public open space is even more pressing due to the relative scarcity of public parkland.[6]

We recognize trail immunity comes at a cost to those denied recovery for their injuries on public land. But so did the Legislature, and we must defer to its calculus. Our task is to probe the boundaries of the trail immunity statute to determine whether it applies to this case. For the reasons discussed below, we conclude it does. Therefore, we affirm on trail immunity grounds. Because that disposes of the entire case, we decline to address additional grounds that might warrant summary judgment, whether embraced by the trial court or asserted by the City.

---

[5] Population figures are based on the U.S. Census Bureau's July 2017 estimates, available at <https://www.census.gov/quickfacts/fact/table/US/PST045217> [as of Feb.27, 2018].

[6] For example, the City of Los Angeles ranks 74th out of the 100 largest U.S. cities in the Trust for Public Land's Parkscore 2017 analysis, which considers park acreage, facilities and investment, and access. (Available at <http://parkscore.tpl.org/rankings> [as of Feb. 27, 2018].) The Los Angeles County Department of Parks and Recreation published a countywide assessment of available parks and open space in 2016. (Available at <http://lacountyparkneeds.org/final-report> [as of Feb. 27, 2018].)

4

## STANDARD OF REVIEW

"A party is entitled to summary judgment only if there is no triable issue of material fact and the party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. (*Id.*, subd. (p)(2).) If the defendant meets this burden, the burden shifts to the plaintiff to present evidence creating a triable issue of material fact. (*Ibid.*) A triable issue of fact exists if the evidence would allow a reasonable trier of fact to find the fact in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

"We review the trial court's ruling on a summary judgment motion de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opponent. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77].) We must affirm a summary judgment if it is correct on any of the grounds asserted in the trial court, regardless of the trial court's stated reasons. [Citation.]" (*Grebing v. 24 Hour Fitness USA, Inc.* (2015) 234 Cal.App.4th 631, 636-637.)

## FACTS AND PROCEDURAL BACKGROUND

On the evening of September 14, 2013, Arvizu went to his friend Ben's house to watch a pay-per-view boxing match on television.[7] At about 1:00 a.m. on September 15, 2013, he received a call from his friend Lalo to "hang out," so he and Ben went to Lalo's house where they met up with Lalo and three other friends, Frijol, Jerry, and Max.

Sometime around 3:00 a.m., the six friends decided it would be fun to go "ghost hunting" at the Colorado Street Bridge in Pasadena. Built in 1913, the bridge is known for its distinctive Beaux Arts arches, and is sometimes referred to as "Suicide Bridge." The young men had heard ghost stories about it. The bridge rises 150 feet above the Arroyo Seco stream, and crosses the Arroyo Seco Natural Park.

Owned and operated by the City of Pasadena, the Arroyo Seco Natural Park is that city's largest public open space. While not a wilderness, like the mountains that so inspired Muir, it contains approximately 22 miles of trails and myriad recreational opportunities. Its trails link to those of the Angeles National Forest, and the Rim of the Valley trail system. They also offer access to a variety of recreational facilities, including playgrounds, multipurpose fields, a casting pond, an archery range, an aquatic center, a museum, a golf course, and the Rose Bowl. The Arroyo Seco stream passes through the Park.

---

[7] We refer to the people who accompanied Arvizu to the Arroyo Seco Natural Park by their first names, or nicknames, as that is how the parties refer to them. Although we have not been directed to support in the record, Arvizu's opening brief tells us he was 21 years old when injured.

Lalo drove the six young men (in his five-passenger car) to the Park. The Park is closed from dusk to dawn. At the first place the group tried to enter the Park, they found locked gates and fencing too high to jump over. When the Park is open, the Arroyo Seco Trail (Trail) can be accessed from 10 different trailheads.

Sometime in the early hours around 3-4:00 a.m. (the exact time is disputed but immaterial), Lalo parked his car in an unmarked paved area at the intersection of Arroyo Boulevard and Arroyo Drive, across the street from the Park. The young men got out of the car, crossed Arroyo Boulevard, and entered the Park. Pasadena Municipal Code section 3.24.110 (A)(23) makes it illegal to be in the Lower Arroyo section of the Park, where the young men entered, and where the accident occurred, from dusk to dawn.

Ben testified that he had been there before and knew about a trailhead that provided access to the portion of the Trail under the bridge, but "didn't want to walk the whole thing. I just wanted to get to that part of the trail" under the bridge.

So they took a shortcut to the Trail. Ben and the others started to walk down a natural slope, into the Arroyo Seco (except Jerry, who remained behind). There was no pathway where they walked down the slope, although the Trail ran below them, roughly parallel to the stream. They were heading toward the Trail, traveling in a direction roughly perpendicular to its path.

It was dark. None of them had a flashlight. There may have been some light from a streetlamp on Arroyo Boulevard. But there was no moonlight.

They were someplace they weren't supposed to be, breaking the law, taking a shortcut in the dark, doing something they were unprepared for. That's when the trouble started.

Arvizu headed down the slope. He did not know where they were going; he merely followed his friends. He does not recall if he was wearing his prescription glasses. Arvizu, who was wearing 1-2 year-old athletic shoes, started to slide in the loose dirt. He grabbed a pipeline that was above ground, and used it to assist in his descent. But the pipeline ended before he was all the way downslope.

He could see his friends standing below him, on or near the Trail. Letting go of the pipe, he continued down the slope, which became steeper as he neared the bottom. He tried to slow himself down, but was unable to do so. He lost his footing and tumbled head over heels. Unable to slow down as he reached the Trail, he traveled all the way across it.

The Trail, at that location, is relatively level and proceeds along the top of, and just behind, an approximately 10-foot-high concrete retaining wall or embankment. After crossing the Trail, Arvizu sailed over the retaining wall, hit a tree limb, and landed on the dirt and rocks below. There was no guardrail.

Ben, who was on the Trail as he watched the accident happen, testified he saw Arvizu coming down the slope, "trying to get his body to adapt to the speed that he was going, but he just couldn't. He was – once he hit the trail, it was already too late." Because he had been there before in daylight, Ben knew there was a drop-off at the retaining wall, but didn't think to mention it to the others because he thought they would see it. Arvizu testified he didn't see the drop-off that night.

The City indicated it did not know who built the trail or retaining wall, or when they were built. But an expert retained by Arvizu located records that the slope in the area of Arvizu's accident had been extensively modified from 1952-1956 as part of

construction of an abutment to the State Route 134 (Ventura Freeway) Bridge, which also crosses the Arroyo Seco near the point of the incident. The expert said the work included "construction of a conventional concrete retaining wall to protect the slope and abutment from scour and erosion during flooding in the [Arroyo Seco stream] channel," and "placement of fill soil behind the retaining wall to raise grade." Plaintiff offered no evidence of prior accidents at the site.

Another expert for Arvizu, Brad Avrit, provided photographs of the accident site. These photographs show the Trail traveling close behind, and roughly parallel to, the top of the concrete retaining wall, as do other photographs. The trial court sustained the City's objection to Avrit's opinion that the wall was dangerous when used with due care because it was not obvious to members of the general public, noting Avrit "does not . . . discuss whether the wall would be obvious during daylight, which is the only time when the park is open. He therefore fails to discuss whether the wall was dangerous when used with due care."

## DISCUSSION

As noted above, the trial court granted summary judgment to the City on two alternative grounds. The first was the City is immune from liability under the trail immunity statute, section 831.4, subd. (b). The second was there was no dangerous condition of public property, because there was no evidence that the area was unsafe when used with due care. We affirm on the first ground, which is dispositive.

Section 831.4 provides in relevant part:

"A public entity . . . or a grantor of a public easement to a public entity for any of the following purposes, is not liable for an injury caused by a condition of:

> (a) Any unpaved road which provides access to fishing, hunting, camping, hiking, riding, including animal and all types of vehicular riding, water sports, recreational or scenic areas and which is not a (1) city street or highway or (2) county, state or federal highway or (3) public street or highway of a joint highway district, boulevard district, bridge and highway district or similar district formed for the improvement or building of public streets or highways.

> (b) Any trail used for the above purposes.

> (c) Any paved trail, walkway, path, or sidewalk on an easement of way . . . ."

Because the unpaved Trail is a trail used for hiking and access to recreational and scenic areas, (b) is the relevant subdivision. (*Amberger-Warren v. City of Piedmont* (2006) 143 Cal.App.4th 1074, 1078 (*Amberger-Warren*) ["The trail immunity provided in subdivision (b) of the statute extends to trails that are used for the activities listed in subdivision (a), and to trails that are used . . . for access to such activities."].) Subdivision (a) only applies to roads, and subdivision (c) applies only to a *paved* trail, so they are inapplicable in this case.

In an effort to escape trail immunity, Arvizu argues strenuously that the statute is inapplicable because (1) he was not using the trail, and (2) he was not injured by the trail or any condition of the trail, but instead by the lack of guardrails or

10

warnings along the retaining wall. He asserts these defects had nothing to do with the trail's location and design. None of his arguments is well-taken.

In keeping with these arguments, Arvizu's complaint identifies the alleged dangerous condition as: "a ten feet high [*sic*] man-made wall which created a dangerous drop off from the adjacent terrain and which was obstructed and obscured by foliage and other growth, particularly at night when there was minimal lighting at best, without providing any warning, guarding or safety features to ensure that anyone traversing said property would not fall from said man-made drop off to the hard ground below and suffer serious injury."[8] He disavows any contention that the slope he traveled down was a dangerous condition, or that the Trail (or any condition of the trail) caused his injury. His expert identifies the alleged dangerous condition as the lack of warnings or a guardrail "along the edge of, or adjacent to, the concrete wall to minimize potential exposure to the fall hazard."

Arvizu's first argument, that he was not using the Trail, is contrary to the undisputed evidence. The group headed down the slope for the purpose of reaching the Trail. The rest of the group (except Jerry) was on or near the Trail at the time of the accident. As Ben's testimony confirms, Arvizu too, was on the Trail – albeit, briefly – before falling off the concrete retaining wall. He had to cross the Trail to get to the wall, and would not have suffered his injuries had he not crossed over the Trail.

---

[8]     The complaint initially contained a negligence claim, but it appears to have been abandoned or dismissed by the time the trial court decided the summary judgment motion. In any event, negligence is not a theory Arvizu pursues in this appeal.

His remaining arguments, as the trial court noted, are refuted by *Amberger-Warren*. In that case, the plaintiff was injured while visiting an unleashed dog park operated by the City of Piedmont. When she went up a pathway in the park, she was bumped by a dog, "slipped on some debris on the pathway, and fell backward, landing 'part-way off' the pathway. To avoid going down the hill next to the pathway, she grabbed an exposed cement edge as she fell, and injured her hand in the process." (*Amberger-Warren, supra,* 143 Cal.App.4th at p. 1078.) She contended that trail immunity did not apply because her injury was not caused by a condition of the trail. Rather, she maintained that the accident resulted from "other dangerous conditions, allegedly unrelated to the trail, that defendant created, including: allowing dogs to run unleashed in the park; permitting debris to accumulate on the trail; failing to install a guardrail where the accident occurred; and locating the trail in a dangerous area, i.e., next to a slope onto which people could fall." *(Id.* at p. 1083.)

The court rejected these arguments. First, it observed that it is well-established that trail immunity covers negligent maintenance of a trail, so defendant could not be liable for the debris on the trail. (*Amberger-Warren, supra,* 143 Cal.App.4th at p. 1084.) Second – and more relevant to the claims asserted here – the court held that trail immunity must extend to claims arising from the design of a trail, such as claims for lack of a handrail. (*Id.* at pp. 1084-1085.) "We presume that there are many miles of public trails on slopes in this state that could be made safer with handrails, and that handrails would perhaps enhance the safety of all trails, wherever located, that bear pedestrian traffic. But to require installation of handrails along every public trail where it might be reasonably prudent to do so

12

would greatly undermine the immunity's objective of encouraging access to recreational areas," because the burden and expense of doing so might cause the government agencies to close them to public use. (*Ibid*.)

Finally, the *Amberger-Warren* court rejected the argument that immunity did not apply because plaintiff identified the hill next to the trail, rather than the trail, as the dangerous condition. The court reasoned that the condition of the hill is not unrelated to the trail, because the trail is what provides access to the hill, and exposure to the alleged danger. "Plaintiff is in effect arguing that the trail is situated in a dangerous location [citation], but location, no less than design, is an integral feature of a trail, and both must be immunized for the same reasons." (*Amberger-Warren, supra,* 143 Cal.App.4th at p. 1085.) "To accept plaintiff's argument would be to require installation of handrails or other safety devices on trails, or relocation of trails, whenever the surroundings could otherwise be considered unreasonably dangerous. The likely and unacceptable result, which the immunity was created to avoid, would be the closure of many trails in areas that could be deemed at all hazardous." (*Ibid*.)

So, too, in this case. At the location where Arvizu was injured, the Trail runs along the top of the concrete retaining wall. Very little space separates the edge of the trail and the top of the wall. Any guardrail or warning signs would therefore have to be placed along the trail. For the reasons articulated in *Amberger-Warren*, the City of Pasadena is immune from claims that warnings or guardrails are required to protect against falls from the Trail over the concrete retaining wall, or that the Trail should be relocated to a safer location, because these claims concern the location and design of the trail.

13

Like the court in *Amberger-Warren,* "we would like to live in a world of resources sufficient to guarantee reasonable safety at all times, [but] 'users of recreational trails . . . generally understand the risk of injury inherent in [their use],' and recognize that ' "[a] large portion of the activities comprising modern public park and recreation programs . . . might well be curtailed, deferred or even completely eliminated if the risk of tort liability were to impose unduly large obligations upon the public treasury." ' " (*Amberger-Warren, supra,* 143 Cal.App.4th at p. 1085, *quoting Treweek v. City of Napa* (2000) 85 Cal.App.4th 221, 234 & fn. 9.)

We note that cases following *Amberger-Warren* underscore its holdings. For example, in *Prokop v. City of Los Angeles* (2007) 150 Cal.App.4th 1332, 1335, the court upheld trail immunity against a claim by a bicyclist who sued the City for injuries suffered when, after ignoring a sign instructing him to " 'WALK BIKE,' " he collided with a chain-link fence immediately after exiting the City's bikeway. Having rejected the bicyclist's claim that the bikeway was not covered by trail immunity, the court addressed his contention that immunity was inapplicable because his injury was caused by the design of the bicycle gate, rather than the condition of the bikeway. Relying in part on *Amberger-Warren*, the court reaffirmed that trail immunity extends to claims arising from the design of a trail. (*Id.* at pp. at pp. 1341-1342.) The court also rejected the bicyclist's contention that trail immunity did not apply because his injury occurred outside the immediate confines of the bikeway. *(Id.* at p. 1342.) And the court rejected the bicyclist's contention that his duty to warn claim was not also barred by trail immunity. (*Ibid*.)

14

Similarly, in *Montenegro,* the court affirmed summary judgment on trail immunity grounds against the plaintiff, who allegedly sustained injuries by falling over a protruding tree trunk while walking along the City of Bradbury's Royal Oaks Recreational Trail. The undisputed evidence established that the path was designed and used to expand bicycle, equestrian, pedestrian and recreational access in Bradbury and the neighboring community of Duarte. But Montenegro argued, among other things, that she did not use the trail for recreational purposes; she used it merely to avoid traffic on the nearby road, as a pedestrian ordinarily would use a sidewalk. The court held that "[t]he fact that a trail has a dual use – recreational and non-recreational – does not undermine section 831.4, subdivision (b) immunity." (*Montenegro, supra,* 215 Cal.App.4th at p. 932.) As applied to this case, *Montenegro* supports the conclusion that trail immunity does not depend on the nature of Arvizu's brief use of the Arroyo Seco Trail, but instead derives from the uncontested recreational nature of the Trail itself. *Montenegro* also reaffirms that trail immunity applies to any trail developed and used for recreational purposes, regardless of any unnatural conditions or the urban location of the trail. (*Id.* at p. 931.)

*Leyva v. Crockett & Co., Inc.* (2017) 7 Cal.App.5th 1105 (*Leyva*), is another recent case applying trail immunity. In that case, Crockett, the owner and operator of a golf course, granted easements to the County of San Diego for a public, unpaved, recreational and hiking trail running along the border of the golf course. A six-foot-high chain-link fence and a line of eucalyptus trees separated the trail from the golf course in the area of the 13th hole. As the Leyvas walked along the trail adjacent to the 13th hole, a stray golf ball struck one of them in the eye, causing

permanent injury. They sued Crockett. The trial court granted summary judgment for Crockett based on trail immunity. (*Id.* at pp. 1107-1108.)

The Leyvas contended trail immunity did not apply because the injury was caused by Crockett's failure to erect safety barriers on the 13th hole of the golf course, not by a condition of the trail. The Court of Appeal disagreed. Relying on *Amberger-Warren*, the court held that trail immunity must extend to claims arising from the design of the trail, as well as its maintenance, and that location, no less than design, must be immunized for the same reasons. The injured plaintiff "would not have been struck by the golf ball if he had not been walking on a trail located next to the golf course. Just as the trail's location next to a hill in [*Amberger-Warren*] is an integral feature of the trail, so is the trail's location next to the golf course. Further, it makes no difference whether the alleged negligence in failing to erect safety barriers along the boundary between the golf course and the trail occurred on the golf course or on the trail itself because the effect is the same." (*Leyva, supra,* 7 Cal.App.5th at pp. 1110-1111.) Analogizing to the handrails discussed in *Amberger-Warren*, the court noted that pathways along golf courses could be made safer by erecting high barriers between the two, but "the burden and expense of erecting barriers to make recreational trails entirely safe from errant golf balls would chill private land owners, such as Crockett, from granting public easements to public entities along golf courses, resulting in closure of such areas to public use." (*Id.* at p. 1111.) "Crockett," the court continued, "is absolutely immune from liability under section 831.4 arising from injuries caused by conditions of the trail, *including* injuries arising from the trail's location and design." (*Leyva,* at p. 1111.)

Finally, Arvizu directs our attention to *Garcia v. American Golf Corp.* (2017) 11 Cal.App.5th 532 (*Garcia*), which became final after briefing was completed in this case. Coincidentally, the case concerns other features of the Arroyo Seco Natural Park unrelated to this case: the commercially operated, revenue-generating Brookside Golf Course, and the nearby paved pedestrian walkway along the Rose Bowl Loop. (*Id*. at p. 536.)

In *Garcia*, a child was struck in the head and badly injured by an errant golf ball while his mother was pushing him in a stroller on the walkway. The child and his mother sued American Golf for negligence and the City for dangerous condition of public property. (*Garcia, supra,* 11 Cal.App.5th at p. 537.) The trial court granted the City's motion for summary judgment on trail immunity grounds. (*Id*. at p. 539.)

A different division of this court reversed. It assumed, without deciding, that the paved pedestrian walkway was a trail for purposes of section 831.4. And it concluded that even if the City could claim trail immunity with respect to the alleged unsafe condition of the walkway (exposure to errant golf balls), it could not do so for the alleged unsafe condition of Brookside Golf Course (insufficient barriers or unsafe design). The two, it concluded, were not sufficiently related. (*Garcia, supra,* 11 Cal.App.5th at pp. 544-546.)

In doing so, it distinguished *Amberger-Warren*, *Prokop*, and *Leyva*, principally on the ground that Brookside Golf Course is a "commercially operated, revenue-generating enterprise." (*Garcia, supra,* 11 Cal.App.5th at pp. 545-546.)

17

The court in *Garcia* assumed that imposing liability on the City for its revenue-generating golf course likely would spur correction of the defects at the golf course, which it assumed could be paid for out of the revenue generated, and would be unlikely to cause closure of the walkway. "As a commercial enterprise that generates revenue, the Brookside Golf Course can pay for safety features . . . . It can obtain insurance, and it can pay lawyers and judgments." (*Garcia, supra,* 11 Cal.App.5th at p. 545.)

"Based on these considerations," the court held "a public golf course cannot assert a trail immunity defense when: (1) the golf course is adjacent to a trail abutting a public street; (2) the golf course is a commercially operated, revenue-generating enterprise; (3) the golf course has a dangerous condition that exposes people outside it to a risk of harm from third parties hitting errant golf balls; and (4) the dangerous condition of the golf course caused harm to a user of the trail." (*Garcia, supra,* 11 Cal.App.5th at p. 546.)

This case, of course, does not involve a golf course or any revenue-generating City asset. Therefore, *Garcia* is inapposite, and of no assistance to Arvizu's effort to avoid trail immunity.

## DISPOSITION

For the reasons discussed above, we conclude that Arvizu's claim against the City of Pasadena is barred by trail immunity pursuant to section 831.4, subd. (b).  The judgment is affirmed on that basis. The City is awarded its costs on appeal.


CURREY, J.[*]

We concur:


EDMON, P. J.



EGERTON, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/23/18

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JONATHAN ARVIZU, | B277951 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC550929) |
| v. | |
| CITY OF PASADENA, | |
| Defendant and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed on February 27, 2018, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports.

[There is no change in the judgment.]

_____

CURREY, J.*               EDMON, P. J.     EGERTON, J.

_____

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20